Good morning, Your Honors. May it please the Court, my name is Laurie Ann Wright, and I represent the plaintiff and appellant here today, Nationwide Transport Finance. I would like to reserve about four minutes of my time for rebuttal. I thought today I would focus on the real pivotal issue in the case, and that is the exclusion of the Uniform Commercial Code from the trial, both from witness testimony and from the jury instructions that were given. It really divides up into three points. The first one I'll start with is the substantive issue, and that is, and I'll refer to it as the UCC, where does the UCC fit into our client's case? Yes, in other words, your argument really is just a legal argument. If this provision of the UCC is relevant, you win. If it's not relevant, you lose. In the case of the interference torts, there were the two intentional torts, one for existing contracts that were broken and the prospective. And Nevada law and this circuit have not yet decided what makes conduct under those torts improper. But what Nevada has done is cited a footnote in one of its opinions called LTR Stage Lines. It's a 1990 case. In the footnote, it does talk about that we must actually cite to Section 767 of the restatement. So we briefed it based on that. It seems likely that's what Nevada would do. Under the restatement approach, 767, there's a seven-factor balancing test that a court is to do to determine if conduct is improper. And improper is an element of both the prospective interference tort and the existing interference tort. There's some discussion in the case as whether it's either an improper element or a defense of justification. But either way, we're talking about the same thing. Either way, it was at issue in both torts. And the first of those seven factors under 767 is nature of the conduct. And the restatement's comments in the case law all talk about this really being the most important element, nature of the conduct. And if you go through the comments to the restatement, one of the examples they give is a violation of statute. Or they also refer to a conduct that's contrary to established public policy. This is where we argue to the trial court the UCC fit in. The specific provision of the UCC, which has been adopted wholly into Nevada law, is 9406. It's the lifeblood of factors everywhere. As your honors know from the briefs of my clients, a factor who bought trucking invoices, those invoices were outsourced for payment by the shippers who were to pay them to Apelli, the defendant, CAS information services. From what I understand of this industry, freight bills are complex, so a lot of shippers do outsource the payment of those bills to companies like Apelli CAS. Could I go back to the improper act issue? Sure. And here's where I was struggling a bit. I understand how the agent's liability could be imputed to the principle, but I haven't seen a principle of agency law or any specific provision that would impute the shipper's liability and their liability under 9406 to an agent, even if we assume CAS was an agent. Can you point to any restatement or any specific statute that would say CAS has any liability under 9406? I don't think there is one because we're suing on the tort. I mean, I understand the question that you're asking, and my response to that is we're not suing for the underlying debt. If that were the case, then such an agency statute would click in. But what we're saying here is there is a uniform national law of commerce that says who is to be paid. My client, the factor after notice, CAS, agent or not, has the duty and the job of paying invoices to the right person. It has no legal obligation, right? It might have a contractual obligation with Nationwide, but we don't see those contracts in the record. That's true. But this is an intentional tort for interference. This isn't a lawsuit on the underlying debts. We would definitely have those agency issues if we were suing all the various CAS for not paying the debts for the actual unpaid invoices. But here we have a company that knows of a UCC provision and is completely ignoring it, requiring instead... But it might be allowed to ignore it. Let me make sure I got the narrative here as to what's going on. Sure. For quite some time, CAS, who is paying on behalf of various shippers to various people, including to factors, although, yeah, the factors are not a major customer that they pay to, but they've had this Hold Harmless Agreement in effect between you, between it and your client for quite some time. A new guy comes in, and then he operates for a little while. When he learns about the Hold Harmless Agreement, he repudiates it. And at that point, CAS says, well, we can't do business with you without the Hold Harmless. If you want to continue the Hold Harmless, we're happy to do business with you. And your client says, well, no, we won't do the Hold Harmless, and then, okay, so we're not doing business. How can that be an intentional tort when it's... There was what appeared to be a fairly smooth commercial relationship until it was your client who says, you know, this agreement we've been party to for all this time, we're not going to do it anymore. I have a couple of responses to that. The testimony was disputed about whether this agreement really was in effect for 17 years. I mean, the fact of the matter is it was never mentioned for 17 years. It was signed in 1986, and it was never mentioned. And the only evidence that ever came up was when the last dispute, 17 years later, and, in fact, there was testimony that in 1992, CAS said to my guy, David Carney, the new guy, why don't you sign one with us? And he said, no way. The other response to that is, you know, my client refused to sign that new Hold Harmless because he believes in the UCC. He's a factor. He lives and breathes by it. It's a completely unconditional right to get paid. It's how they do their business. No, it does not. That is to say, what 9406 does is say, okay, whatever obligation there was to pay by the debtor on the account, transfers to the factor once notice is provided. But it doesn't say what the actual obligation is. It just says the obligation transfers once notice is provided. And the testimony was, even from CAS employees, that yes, if I got proper notice and if the documents were correct, we are obligated under the UCC to pay the factor. Well, the shipper has the obligation. I mean, there's nothing in 9406 that says CAS has any obligation. You know what's interesting? I did pull the site out for this. Nancy Moon, who worked at CAS for years, testified that under their contracts with their shipper clients, that if they paid the wrong person, CAS was actually personally responsible for making a double payment. And that's what the reporters said. Which is why they want that Hold Harmless agreement. Yes, yes. But my client's whole point is the Hold Harmless agreement is a release. If you already have a right to get paid, why should you be, by economic standards, the trucker and the shipper at the beginning of the relationship? But by the time the factor gets the invoice, the contract's already formed. You're just left with 9406 that says who do you pay after notice the factor. And, you know, going back to Judge Acuda, what you were talking about, the agency issues, I mean, if the answer is that the only person who's ever liable to follow a statute is the principal and not the agent, then we have a situation of multiplicity of lawsuits. Let me ask you about that. I mean, is there anything, I mean, the person who's obligated to follow a statute is the person who's named in the statute. And there are some UCC provisions that say an agent is also liable. This one does not. And so what is the principle or statute that would make an agent liable? But it's not liability on the debt. It's a tort. It's a tort for interference. Right, but CAS needs to have an improper act. I mean, that's the problem here. In other words, there's no improper act if CAS has no legal obligation to take an act. That's where I'm having trouble. Well, there are cases that have certainly held that agents are responsible for violating statutes. I mean, clearly, if their job, their duty as an agent is to pay bills, shouldn't they follow the rule that says who they pay those bills to? Because if you don't, then they can do what CAS did and completely refuse to pay someone that they're obligated to pay, knowing it's going to cause a lot of lost customers, which is what happened here. Well, my problem is I'm not sure why CAS is obligated to pay. If there were a contract in the record between CAS and the shipper, under which CAS agreed in that contract to step into the shoes of the shipper, that is to say to step into the shoes of the debtor on the account, and a third-party beneficiary of that contract were any carrier or factor, fine, but that contract is not in the record. So I have trouble understanding how we know that CAS has this obligation to pay that equals the obligation of the original shipper. I think all these issues go back to the assumption that the UCC is only relevant if CAS per se violated it. And if you look at the comments to the restatement, it's not only violations of law, it's not abiding by the rules of the game. And that's why the UCC is relevant. Yes, CAS is not an account debtor. We couldn't sue them on the actual debt. They didn't actually per se violate the law because they're not the account debtor. But clearly the UCC was like the elephant in the room. It's why my client decided I'm going to stick up for the UCC. I'm not going to release my rights to get paid. Under 9406, I gave proper notice. They should pay me. I have to say, you've said this now a couple of times, that you think the Hold Harmless Agreement is a release of a right to get paid. I don't read the Hold Harmless Agreement to say that. Well, I mean, it does. It does say, I have a copy of it here. I read it too. I just keep going back to the distinction that this is a tort for interfering with business. CAS knew that the rules of the game in factoring is after notice, you pay the factor. Lots of testimony. What the Hold Harmless Agreement is doing, not only that I think is what it says, but clearly its function has been that CAS is worried that it might make a mistake. It might pay the factor when it wasn't supposed to pay the factor, but instead was supposed to pay the carrier, or it might pay the carrier when it's supposed to pay the factor, and it doesn't want to have to pay twice. I mean, that's what this is doing. Isn't that right? Isn't that the function of the Hold Harmless? And hasn't that historically been the practice, that that's the function of the Hold Harmless Agreement? Only with CAS. Actually, quite frankly, it was never used for 17 years. Who knows what the function is? If you really look at the parties' relationship, it wasn't one based on the Hold Harmless, because any time there was a problem, CAS didn't have to help. All they had to do was pull out the 86 Hold Harmless and say, well, sorry, we made a mistake. No, there's quite a bit of testimony that what CAS, and you point to it in your brief, that over the years when this happens, CAS goes in and makes it right. But as I look at what CAS does, it's able to make it right. It's able to say, I'll pay you, and so on, because lying behind it, it has the protection of the Hold Harmless. And because of the Hold Harmless, it can make things right without being worried that it's going to have to pay twice. Well, this dispute arose because they actually didn't try to make it right. They just pulled out the Hold Harmless and said, you know what, not this time. You released us 17 years ago, so you know what, too bad, we paid the wrong person, we're not going to do anything. That's what the dispute happened. It was FWC Trucking, I think, $25,000 in bills. That's how this entire dispute started. And I think it's important that CAS admits in their briefs that their client, the shipper, does not have a right to a Hold Harmless. So why should an agent have that right, just because they're an agent? There's just not something right there. Just because they're not the actual account debtor, they're entitled to squeeze a release out of the other side just so they can get their check? It's just not right. And it doesn't make sense to me, if someone owes you money, why would you agree to release your right to get paid just to get paid? It just doesn't make any sense. Well, Nationwide clearly could go against the shippers, and so it wasn't giving up its right to be paid. It could tell the shippers, you have to pay me directly, see the UCC. So it appears that there was just more bargaining power on the side of the shippers, and so they could say, tell the carriers, don't deal with Nationwide anymore. So I'm not seeing that Nationwide was giving up any rights. It was just commercial realities of this particular situation. Well, it was giving up the right to go after CAS to help get the money where it paid to the wrong place. I mean, it was giving up that right. But Nationwide had no legal right vis-a-vis CAS. They had the legal right against the shippers. On the underlying debt, if that's true, which would be, if we had this situation and we didn't have this tort available to us, which really we didn't with the UCC barred from the trial, the answer is, I would say out of all the lost customers, there were probably over 50 shippers involved. Talk about multiplicity of lawsuits. If our only remedy for an agent of an account debtor ignoring the UCC is to go sue all the underlying account debtors for the actual debt, I mean, that's just multiplicity of lawsuits. That's a lot. I mean, a tort was committed. There was a company here, agent or not, who knew the UCC applied and ignored it and decided, you know what, I have superior bargaining power. These factors, I mean, their lifeblood is getting paid. That's what they're in the business doing. Is there anything in the record one way or the other as to whether other companies in the position of CAS have hold harmless agreements? I know my client testified it's the first time he'd ever seen it in his 40 years of business. I couldn't give you the pin site, but I know, and I know that is included in something I cited. There was testimony. CAS is a big company. These people want to get paid. It's either sign this or you don't get your check. I want to stick with that point for a minute. So we do have testimony from your client that says he's never seen this before? Yes. From any other company? Yes. And that's all we have in the record on the point? Yes, that I know of, yes. So, and I just want to reemphasize, you know, comment G to 767 of the restatement does talk about the rules of the game. So I understand your concerns that this CAS is not the account debtor. They're not the one who's actually liable under 9406. But it's still a rule of the game in factoring that after notice the factor gets paid. CAS ignored that. They said, you know what, if you don't sign the hold harmless, we're not going to pay you. Despite notice, despite you giving us all the proper documents, we don't dispute your owed the money. And the testimony showed that they actually had the money to pay the bills, they just won't without the hold harmless. And again, I want to reemphasize, they admit in their brief that the account debtor themselves can't insist on a hold harmless. So why can CAS, just because it's an agent, step in and ask for one? Just because they're not the account debtor doesn't make sense. And my client rescinded that hold harmless because he believes in the policy of the UCC. He's been a factor for over 40 years. He relies on it, and this Court has said that the UCC is, you know, national law of commerce. It's there so businessmen can predict the likely result of their transactions. Any factor will want to predict after they get notice that they'll get paid, not that someone's going to step up, agent or not, and say, well, you know what, we're not going to pay you unless you agree to release us in case we don't pay you. But if we get your argument in hand, why don't we hear from the other side, and then you've got just over two and a half minutes to respond. Thank you. May it please the Court, my name is Eric Trells, and I represent the Appellee in this case, and that's CAS Information Systems, Incorporated. In order for this Court to grant relief to nationwide requests, the Court has to accept one of two options. It's our position that neither of these options is acceptable under the record of this case and the law that applies to this case. The first option is for this Court to essentially rewrite 9-406 to not just cover account debtors, but to cover payment services like CAS Information Systems or other companies that may be payment agents or companies that act on the behalf of account debtors. That language presently is not in the statute. The statute is very clear, it's very concise, and it's understandable. And every Court that has had the opportunity to construe 9-406 or its predecessor statute has found that an agent is not the same as an account debtor. So, really, this Court would have to rewrite the statute, and that's not an acceptable option. The second option would be to rule that CAS is the equivalent of an account debtor, or that CAS stands in the shoes of the account debtor. Now, such a ruling would have a significant impact on commercial transactions under 9-406, because if... Well, under UCC 9-102A3, it defines account debtor as a person obligated on an account. The case law says that means the original obligor is the account debtor. There's no dispute in this case that CAS is not the original obligor. No, it seems to me your second argument is just a restatement of your first. Let me give you another option. You agreed to be the agent to pay the debtor the account debtor, did you not? No, we did not. What did you do? CAS did not agree to pay the debt? You said agent, Your Honor. What other word is appropriate? Payment service. What? Payment service. Payment service. Yes. But normal rules of agency, the principal has to pay. He hires somebody to pay. That person is an agent. You don't like the term. I don't know why, but most people would say that's he's an agent. But anyway, there's no dispute that CAS has agreed to pay the debt that the shipper owes, correct? There's no dispute about that. Well, Your Honor, there's a factual indication. No, answer my question. There is, yes. There's a dispute, sir. What dispute? Yes. Well, first of all, Mr. Carney testified himself that CAS does not have to pay the debt if the shipper doesn't pay CAS. Also, CAS does not pay CAS. Oh, yeah. CAS does not have to pay the debt if the notice of assignment is not correct. Who pays first, CAS or the shipper? The shipper pays CAS, and then CAS pays. So once CAS is paid, CAS has a duty to pay, right? I'm sorry, Your Honor, I didn't hear that. Once the shipper pays CAS, CAS has a duty to pay the factor. If the documentation is correct, yes. And that's just standard. I mean, it would be crazy if the shipper was giving money to CAS and CAS didn't have an obligation to pay. Nobody would do business that way. It's understood in the business that if the shipper pays CAS, CAS will pay the debt, correct? CAS has an obligation vis-a-vis the shipper to pay the debt, not vis-a-vis the factoring company. That's your position. But once CAS gets the money, he's obliged under ordinary contract law to carry it out by paying the factor. He can't add a term. He's agreed to pay when he accepts the money from the shipper. We don't know what the relationship is between the shipper. Yes, we do. We know how business is done. We know that shippers pay paying agents to pay off their debt. With all due respect, Your Honor, this record does not indicate the relationship between the shipper and CAS. There is no information there regarding what that relationship is. You didn't dispute, as I understand it, that that was the service that CAS was intended to render. Did you dispute that? We disputed the terms of the relationship or any conclusion that would lead one to believe that CAS is the agent or the obligor of the shipper's debt. We were a payment service. That's all this record supports. That means that's a verbal change in words. It doesn't seem to me to carry anything. If you look at the restatement of agency, you're in exactly the position of an agent who has an obligation to carry out the duty that his principal has assigned to him. You're not an account debtor. Your obligation arises out of contract of agency. I respectfully disagree, Your Honor, in that to find agency, you have to have two elements. Number one, an express or implied agreement to be bound by the principal. And number two, evidence that the principal has controlled the manner of performance by the agent. Well, do you have any doubt that when shipper pays CAS, shipper expects CAS to pay the factor? Isn't that the way the business goes? Yes, but there is no evidence that the shipper prevented CAS from entering into any additional agreement it wanted to with the factoring company or the carrier that originally. Well, no, the shipper didn't prevent him, but what basis did he have, did CAS have for extracting the hold harmless agreement? CAS had an obligation to pay the debt. There's no consideration for the hold harmless agreement. Well, what is CAS offering in order to say I won't pay you? I know I've agreed to pay you, but I won't pay you unless you add an additional term. Well, Your Honor, the consideration is the payment of the invoice. If CAS is, if the factor is working for the shipper client and he has an assignment, he can send it to CAS and CAS will pay that as long as there is this hold harmless agreement in place. And that has been the way that CAS has conducted business. But CAS, when he gets the money from the shipper, is in a position where he's bound to pay the factor. Then he says, but I want something more from factor. Could he say I want $100 from factor? I disagree, Your Honor, respectfully. Could he say that? I won't pay you unless you pay $100 for processing. Again, that's, that's. As far as you know, that's what he could do. I have no idea whether he can say that. I understand this is a major business. And I understand, I mean, that this way works well if paying agents pay when they get the money from the people who are paying them. But you say, no, you can hold them up for something else. This is not holding up, Your Honor. This is, we had a commercial problem that we addressed. We have factors that are buying invoices from carriers, and those same carriers are sending invoices to CAS. We have a conflict. Some carriers say, pay me. Don't pay the factor. The factor says you've got to pay us. If we pay the wrong person, then we're asked to make a double payment. We cannot continue business making double payments on bills because it doesn't come out of the shipper's pocket. It comes out of our pocket. Now, 9-406 does not apply to CAS. That is undisputed. That's common ground. That's undisputed. That is the only statute that governs this situation. CAS, therefore, was free to negotiate with the factor any agreement that it wanted to negotiate, which it did. And the agreement in this situation was in place for 17 years. And this relationship, by all admission, was a profitable and excellent relationship. Let me ask you this, and this may help, but let me see if it does. How did this particular fight break out? That goes exactly to the heart of the matter. March me through the narrative of what happened before this, that makes this thing blow up. Absolutely. A company named FWC was a carrier who shipped for a CAS shipper. It factored some of its invoices with Nationwide. Others, it sent directly to CAS. So we're having two invoices come from two different companies. Well, wait a minute. Some invoices come directly and some come through Nationwide. We're not sure if that's the exact case or if there were double invoices. So it's possible you're getting double invoices. Could be. So we make a $25,000 payment to FWC. Nationwide says, no, no, no. You should have done that to us. We said, well, let's look into this. Let's find out what's going on. We look into it, and they say, you pay us now. We said, we've already paid it. They mean Nationwide. Yes, Nationwide said, you pay us now. We said, we've already paid it. They said, if you don't pay it, we will sue you. That's the first time in the 17-year relationship that they threatened to sue CAS. That's the first time that CAS took the Hold Harmless Agreement, gave it to them, and said, you can't sue us. Now, if it had worked in the ordinary way, the way it had been working previously, what would have or what should have happened? CAS would have done everything it could possibly have done to get that money back to Nationwide. That's what happened in the course of that relationship over 17 years. It would have gone to the original carrier and said, listen, apparently you've assigned that one to the factor, and you billed us by mistake or we made a mistake in paying you. Would you please pay the factor? We tell the carrier, we will cancel, we will put a hold on your account. The evidence was we put a hold on your account. You get no more payments, regardless of what shipping you do, until you make this right. And, by the way, the record showed that Nationwide got paid in full, $25,000. By the carrier? It wasn't clear, but it was clear that it was paid. Now, you ask for the genesis of the problem. Mr. Carney, who was not with the company when that agreement was signed, finds out about it in 2003. He says, this is an abomination. I am not going to do business with this company if I have to have a hold harmless agreement. He sends a letter rescinding the hold harmless agreement. Cass says, I'm sorry, our policy is that we don't pay unless you have this agreement, because we've got the exposure to double payments. Is there anything in the record, I asked your adversary the same question, is there anything in the record besides, I gather, the testimony of the Nationwide person, as to whether a hold harmless agreement, such as Cass has or likes to have, is common in the industry? Is it unique to Cass? What do we know about this? The only thing we know is that we produced a stack of hold harmless agreements in this trial. Every factor that we do business with gave us a hold harmless agreement. No, I'm asking you a different question. I understand. I understand what the difference is. I'm asking, there are other people in your position, paying agents like Cass, do they have hold harmless agreements? Do we know this? I don't know that. I do know that Mr. Carney did testify that he had never seen one in 40 years, and that's why he said, I'm going to rescind this thing. I'm not going to pursue what is really a hypothetical, but to explore what you think Cass's position is. Cass has been given $25,000 by a shipper, and the shipper says, this is money to pay my debt. The fact, at that point, according to you, Cass can say to the fact that, you know, I have to process these. It cost me $1,000 to process these. So you pay me $1,000, and then you'll get your money. Nothing wrong with that? Do I have a problem with that? Yes. Is that the question? Yes, because that's not the record. That's not what happened in this situation. No, no, no, it's a hypothetical. I understand that, Your Honor. Well, all right, it's a hypothetical. Will you respond to it? I think that whatever Cass could negotiate with the factoring company was free game. So Cass could hold each factor up for $1,000 extra? I don't see how it's holding it up if the factor agrees. No, it's forcing the factor to agree to it, yeah. Your Honor, the whole premise of your question is that the shipper doesn't have any interest in this whole situation. The shipper has a large interest in making sure that Cass pays the correct party so that it does not have to get involved in the disputes. That's why it gives this entire function to Cass. Well, the relevance of the UCC is it creates a statutory obligation on shipper. Shipper would be out of its mind if it didn't arrange to pay. So any arrangement it makes with a paying agent is to fulfill the statute. It makes that arrangement. Then it would be astounded if Cass said, well, you know, we're in business. We'll take $1,000 off of each of these things to run our business. You say you'll agree to that. Well, Your Honor, what I said, if you remember, is I said if the factor will agree to it. Oh, yeah, but this is the holdup. The holdup is just like the hold harmless. The factor won't agree with it. The factor says, I won't pay you $1,000. Can Cass then say, okay, we won't do business with you? Yes. Yes? We won't pay your bills. Well, that's wonderful. You have to go to the shipper and get paid. Yes, because 9-406 does not apply to Cass. No, it doesn't apply. Cass is not an account debtor. And Cass has no contractual obligation to the factor to pay it. No, it's a contractual obligation to shipper to carry out the duty he's assumed. Exactly. And look at the restatement of agency, and you'll see it's very clear. We are not the agent, Your Honor. With all due respect, we are not the agent, and there is not enough evidence on this record to make that conclusion. You know, I think I have to disagree with you on this point. It's quite clear you are an agent, but there are various kinds of agents. Some agents have certain responsibilities. Some agents have different responsibilities. And even your hold harmless agreement says, whereas Cass is or may become the paying agent for freight bills. So where you're an agent, the only question is, what are the terms of your agency? Exactly. We don't know. We don't know. The hold harmless agreement says you're not an agent, and the hold harmless agreement says you are. It says is or may become. It doesn't say we're the agent. You know, I think you're miscarrying the argument, and I'm not asking you to say something that in my mind is going to cause you to lose the case. It's clear to me that you're an agent. Okay. The only question is, what are the terms of the agency? That's correct. I agree with that. Absolutely. It's entirely possible, and here's where the record is silent. It's entirely possible that your contract with your shippers says, we are happy to pay bills on your behalf to the factor, provided the factor is willing to accept the bill with a hold harmless agreement. And if the factor is unwilling to accept the payment without a hold harmless agreement, we're not paying. That could be your contract with your shipper. Correct. We don't know. But I don't know what's in your contract. But there's nothing illegal about having that contract with your shipper. Correct. That's your defense. Our defense is that we did not interfere with Nationwide's business interests or contracts. That's our defense. This case had little to do – You're claiming you were justified in not carrying out your agency. That's a defense. Yes. If you could have produced that agreement with the shipper, you would have had a good defense. It was a justification, yes. We had business reasons for taking the actions that we did. But you didn't introduce it in the trial. I'm sorry? You didn't put it into the record. It wasn't our obligation to put it into the record. Oh, it's a defense. No, no, no. We did put that into the record. Put what in? Our defense. No. Maybe I'm misunderstanding you, Your Honor. I'm sorry. Did you have an agreement with the shipper we'll only pay the debt we're assuming from you if we're permitted to have a hold harmless agreement? There was no evidence regarding the shipper's relationship with Cass or any agreements. That was your burden. It was not our burden. Well, that's how you get into this position. Otherwise, as you concede, you're the paying agent. Again, Your Honor, the terms of that agency have not been proved, and it's not our obligation to prove those terms. That was Nationwide's obligation. They did not do that. This case was about intentional interference with contract, and I think on that issue the evidence was overwhelming with respect to what Mr. Carney had to say. Mr. Carney said that after he rescinded the 2003 hold harmless agreement, Cass offered him another agreement to sign. That's very compelling. It shows that Cass was not interested in interfering with this company's agreements. They wanted to continue. This 17-year profitable, excellent relationship. But not only more, more than that, he also admitted that if he had signed another hold harmless agreement, this lawsuit would not have been necessary. We wouldn't have had to be here today. There would have been no damages. There would have been no trial. And the jury heard that evidence, and that was compelling. And I believe that's why the jury ruled the way that they did in this case after five days of trial. This had little to do with the UCC or agency law. This had a lot to do with intentional interference with contract and business justification, and the record on the whole is very supportive of the jury verdict. And the judge's rulings with respect to the experts and the jury instructions was well-founded in the trial transcript. Nationwide says that the UCC was the elephant in the room. Look at Mr. Zadek's testimony. I see that I'm out of time. Thank you. Appreciate it. If you'd like to finish your sentence, please go ahead. Yes. I would like to say that if you look at Mr. Zadek's testimony, he testified for 30 to 35 pages on the UCC factoring and agency. So to say that the – Right. Certain parts of the UCC. Certain parts. Certain parts of the UCC was not permitted to testify. Legal conclusions. Yes. Thank you. I appreciate your time. Just a couple points, Your Honor. We did put in evidence of agency, and I agree with Your Honor, Judge Noonan, that if they wanted to use their agreement with the shippers at a defense, they should have produced them. Now, did you have – did you get in discovery the agreement between the shipper and Cass? You know, it's pretrial issues that aren't on our record, to be honest. And we asked about it at depositions. They objected, and they objected in document requests. They said what? We asked for them in discovery. They said no. Of course we asked for them. They just refused it. I'm sorry? They refused to give you the document? Yes. And you couldn't compel it? You could have compelled it. I mean, it's clearly irrelevant. Yeah. We chose not to. You're right. Yeah. But I think Judge Noonan is right in that if they wanted to use it as their defense, they could have brought in the contracts as evidence. And we did prove the portion of the agency relationship that was relevant. We had Gloria Seibel of Cass testify that when Cass gets the money from the shipper, they transmit the funds. That's the reporter's transcript at 277. And Nancy Moon even testified if Cass made the mistake and paid the wrong person, Cass, out of its own money, made the second payment. And that's at 226 of the reporter's transcript. One more time. Is this generic or is this with respect to the specific dispute that made everything blow up? That was generic. Generic testimony. Say that again. The second part was Moon testifying that if Cass made a mistake and paid the wrong person, Cass, out of its own money, was liable to make a second payment. And where is that in the record? 226 lines 18 through 21. It's the reporter's transcript. Well, you know, I'll say this, and I'm not really after you on this one. I need a cite to the ER rather than the reporter's transcript. But some of them, okay. But I could, most of the reporter's transcripts you cite to are in the ER. And I did read this. Okay. So, and this is now, if Cass misses an assignment, I'm now just reading from 226. Okay. Was it asked to make double payment? Yes. Answer. Yes, it would have been Cass's responsibility had we paid the incorrect party. Question. In response to that problem, what did Cass do? Answer. This is what you did not cite to me in your brief. We implemented the hold harmless agreement, recognizing that there were going to be some mistakes could be made with the assignment presented, and that we would do our best to pay them properly, but there would be some difficulty. Question. And who is the entity that Cass asked to sign the hold harmless? The factor. You didn't cite that part to me. Okay. I also agree with Judge Nguyen's argument. It's a great analogy. I mean, here is Cass as an agent saying, hey, sign a hold harmless if you want to get paid, when there's already an existing statutory contractual obligation to pay. And I think he's right. They could have asked for $100, $1,000. No difference in asking for a release. It's the same thing. They don't have the right to do it. Well, they don't have the right to do that because it's inconsistent with their contract with the shipper. I mean, they could have a contract with the shipper that says, listen, we'll pay every one of your shipping bills provided that we get to keep $1,000. And the shipper can say, well, that's nuts. Because the shipper will say, well, there's no way the factor is going to accept that. That's not a violation of any obligation that Cass has to the carrier or to the factor. That's likely to be a violation of an obligation that Cass has to the shipper, because the shipper would be out of his mind to use Judge Nguyen's eloquent and I think proper word to agree to that. Yeah. But that's all supposition. What the testimony from Cass' witnesses were is when we get the money, we pay. There was no testimony that there was this sort of agreement that, well, when we get the money from you, we're going to ask for a hold harmless from a factor and then we'll pay if they sign it. I mean, there's no evidence that that actually occurred. The evidence was when we get the money, we pay, and we pay the right person. And really quickly, I just want to address the assertion that it's somehow— Yeah, you are over, so finish the thought. Sure. That it's confusing who to pay, and that is not true. The evidence showed that when factors give notice of assignment, they always say all accounts. So every single bill, whether factored or not, that comes from that trucker, you pay the factor. And then if it isn't a factored account, the factor just gives 100 percent to the shipper. There is no confusion. You pay all bills to the factor. Thank you. Thank you, Mr. Payton. Okay. Nationwide Transport Finance v. Cass Information System, thank you both for your arguments, is now submitted for decision. The last case on the argument calendar, and I'm not sure I'm pronouncing it right, Safey v. McKazy.
judges: Noonan, Fletcher, Ikuta